Plaintiff, Jim Davis and Company ("Davis"), appeals from a summary judgment in favor of Albuquerque Federal Savings Loan Association ("AFS"), defendant-intervenor, in plaintiff's action against Centennial Office Venture ("Centennial"), defendant, to recover certain rent monies owed by tenants of a building formerly owned by Centennial. The summary judgment was made final pursuant to Rule 54(b), A.R.Civ.P. We affirm.
Centennial owned an office building occupied by a number of tenants under leases that called for the monthly payment of rent. The rents were payable on or about the first of every month for that month in advance.
On May 8, 1985, Centennial gave a promissory note and mortgage on this property to AFS, which conveyed:
 "All buildings, structures and improvements of every nature whatsoever now or hereafter situated on the property described in subparagraph (a) above, all fixtures, machinery, equipment and personal property of every nature whatsoever now or hereafter owned by the Mortgagor and located in, on, or used or intended to be used in connection with or with the operation of said property, buildings, structures or other improvements, including all extensions, additions, improvements, betterments, renewals and replacements to any of the foregoing.
 "Together with all easements, rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interest, privileges, liberties, tenements, hereditaments, and appurtenances whatsoever, in any way belonging, relating to or appertaining to any of the property hereinabove described, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or *Page 56 
hereafter acquired by Mortgagor, and the reversion or reversions, remainder and remainders, rents, issues, profits thereof, and all the estate, right, title, interest, property, possession, claim and demand whatsoever at law, as well as in equity, of the Mortgagor of, in and to the same, including but not limited to:
 "(a) All rents, profits, issues and revenues of the Mortgaged Property from time to time accruing, whether under the leases or tenancies now existing or hereafter created, reserving to Mortgagor, however, so long as Mortgagor is not in default hereunder, the right to receive and retain the profits thereof. . . ."
This mortgage was duly recorded on May 9, 1985, in Jefferson County, where the property is located.
On the same day that the mortgage was executed,i.e., May 8, 1985, Centennial, as landlord, executed a "Conditional Assignment of Leases and Rentals" to AFS, thus assigning all of the rent accruing under said leases. This assignment, which was also duly recorded in Jefferson County on May 9, 1985, reserved to Centennial the right to exercise the powers of landlord under said leases, including the right to collect rents on a monthly basis, unless and until Centennial should violate any of the provisions, covenants, or terms of the note and mortgage. The plain language of the assignment set over unto AFS all rents, subject to Centennial's right to collect them as long as Centennial was not in default under the note and/or mortgage. It also provided:
 "7. WRITTEN NOTICE AS AUTHORITY TO MAKE PAYMENT: A notice in writing by AFS L to the tenants advising the latter that a default has occurred on the part of Landlord in the performance of the terms, provisions and covenants of the aforesaid Note and Mortgage, or of this agreement, and requesting that all future accruals of rent or other payments under said leases be paid to AFS 
L under this agreement, shall be construed as conclusive authority for such payments to be made to AFS L, and from and after the date of the giving of such notice all accruals of rent or other payments under the said leases shall be paid to AFS L, pursuant to this agreement and such notice."
At some point prior to October 3, 1987, the mortgagor, Centennial, defaulted on its mortgage indebtedness, whereupon AFS proceeded to foreclose, advertising the sale of the property, under the terms of the mortgage, on October 3, 10, and 17, 1987. The events which led to this controversy then occurred.
Davis had contracted with Centennial on April 14 and June 9, 1986, to provide janitorial and other services for the building. When a dispute arose between them concerning that contract, Davis sued Centennial and recovered a judgment against Centennial in the amount of $15,255.44, plus costs. To enforce this judgment, the clerk of the Jefferson County Circuit Court issued writs of garnishment which were served on 22 tenants occupying office space in the building under the lease agreements that Centennial had assigned to AFS. The writs were served on the tenants on October 26, 1987, and notice of the garnishments was served on Centennial on October 27, 1988.
On the next day, October 28, 1987, Centennial's mortgage was foreclosed, with AFS purchasing the property. Notice of this change of ownership of the building from Centennial to AFS was given to the tenants on that same day, October 28, 1987, and again on November 2, 1987, advising that rental payments due after October 28, 1987, were to be paid directly to AFS.
Beginning on October 28, 1987, the garnishee-tenants answered the garnishments, some acknowledging possession of rent money belonging to Centennial, some denying any debt to Centennial, and some stating that rent was currently not due. Some answered claiming that the rent was due not to Centennial, but to AFS.
On November 18, 1987, AFS moved to intervene in the case ofDavis v. Centennial, asserting the pertinent facts stated above, and concluding:
 "8. In view of the foregoing, none of the tenants of said building is indebted to *Page 57 
Centennial or otherwise in any way liable pursuant to said Writs of Garnishment for any payments for rent or otherwise for the use or occupancy of the subject premises from and after October 28, 1987.
 WHEREFORE, AFS prays for an order that all payments of rental or any other sums due and owing for the use or occupancy of the subject premises by any of the tenants from and after October 28, 1987 are not due to Centennial or to plaintiff. AFS further prays for an order declaring that said payments are in fact due to AFS and for such other and further relief as is just."
In due course AFS was allowed to intervene, and pursuant to the circuit court's order the tenants paid their rent monies into court. Thereafter, AFS moved for summary judgment based upon the pleadings and motions and the affidavits of James Reich, executive vice-president of AFS, and James Bennett, executive vice-president of the realty company that acted as property manager of the building for AFS. Upon consideration, the trial court granted summary judgment in favor of AFS, ordering the clerk to pay to AFS the amounts being held by the court. This appeal followed.
It should be noted that AFS claims no entitlement to rent monies for October 1987 or before. The issue between the parties, then, concerns rent monies due from Centennial building tenants for November 1987 onward. Davis maintains that its garnishment lien attaches to all rent monies from those tenants, from October 26, 1987, until its judgment is satisfied. AFS, on the other hand, claims those rent monies under the terms of the mortgage and conditional assignment and as purchaser of the leased property on October 28, 1987, at the foreclosure sale under the mortgage. For the reasons that follow, we hold that summary judgment for AFS was proper, and we affirm.
Under the law of garnishment, the money sought "must be due absolutely and without contingency." Escambia Chemical Corp. v.United Insurance Co. of America, 396 So.2d 66 (Ala. 1981). Furthermore, a creditor may not garnish property not belonging to the defendant. Druid City Hospital Board v. Epperson,378 So.2d 696 (Ala. 1979). Thus, notwithstanding that plaintiff Davis gave notice of its judgment to Centennial's tenants two days before AFS bought the property at the foreclosure sale, nevertheless, at that time there were not, and, indeed, could not have been, any sums "due absolutely," because the future rents were not then due to Centennial. That is to say, Centennial, which was in default at that time, could not have maintained an action of debt or indebitatis assumpsit on the unliquidated and unmatured rent payments. Sloss v. Glaze,231 Ala. 234, 164 So. 51 (1935). Nor could Centennial have maintained such an action after the rent became due, because Centennial no longer had a right to collect rents at that time due to its default and the foreclosure.
In Pettus v. Dudley Bar Co., 218 Ala. 163, 164, 118 So. 153
(1928), this Court observed:
 "It is a universal rule that the garnishee is to be placed in no worse condition by operation of the proceedings against him than he would be if the defendant's claim against him were enforced by the defendant himself. Garrett v. Mayfield Mills, 153 Ala. 602, 44 So. 1026. Garnishment proceedings were not intended to entitle a creditor to hold such properties or funds which in truth do not belong to the debtor and which should not as a matter of equity be applied as a payment of his debts."
When Centennial defaulted and AFS foreclosed upon the mortgage, AFS, not Centennial, became the entity to whom the rent monies were to be paid. Therefore, when those rent installments matured, AFS, not Centennial, was the entity to whom those monies were owed, both under the terms of the mortgage and under the terms of the assignment. "In garnishment proceedings, the creditor stands in the debtor's shoes to enforce the debtor's rights against third parties." Druid CityHospital Board, supra. Thus, because *Page 58 
Centennial was owed no rent money after the default and foreclosure, and in light of the earlier assignment, Davis, standing in Centennial's shoes, had no right to the rent monies that it could enforce.
Thus, contrary to the argument of plaintiff, there was no severance of the obligation to pay rent monies in favor of Davis when its notice of the garnishment was served upon the tenants. We believe that the decision in Walsh v. Bank ofMoundville, 222 Ala. 164, 132 So. 52 (1930), supports this position. In that case, one Kelly held a recorded mortgage executed by one Owens in 1915. Several years later Kelly died. E.P. Walsh was appointed Kelly's administrator, and he foreclosed the mortgage, with Carrie Walsh becoming the purchaser. E.P. Walsh conveyed the property to her. The mortgaged property had been in the possession of a number of tenants. These tenants had given rent notes before foreclosure to one Owens, as agent (of the mortgagor) for the annual rent. Owens endorsed these notes to the Bank of Moundville. Although E.P. Walsh did not notify the tenants of anything concerning these rents, he did notify the Bank of Carrie Walsh's purchase of the land and that she would demand the rents for the current year. Nevertheless, the tenants paid the Bank the amounts due under the rent notes, and when the Bank refused to pay over those monies to the purchaser at the foreclosure sale, Carrie Walsh, she sued the Bank.
This Court posed the legal question in Walsh,222 Ala. at 165, 132 So. at 52:
 "[w]hether the purchaser at the foreclosure sale or the mortgagor's assignee, claiming under an assignment made before foreclosure, had the better right to the proceeds of the notes paid by the tenants to the assignee of the mortgagor."
This Court went on to uphold the right of the purchaser at the foreclosure sale, 222 Ala. at 166, 132 So. at 53:
 "Unless it is made payable in advance, no claim for rent arises until the lessee has enjoyed the premises during the whole time for which the payment of rent is stipulated to be paid. Rent cannot be apportioned as to time. Whoever owns the reversion at the time the rental falls due is entitled to the entire sum then due. And from English v. Key, 39 Ala. [113], 117, from which, in substance, the foregoing statements of law are taken, we quote: 'Rent is incident to the reversion; and the lessor's transfer of the reversion, though without the tenant's attornment to the assignee, or any express mention of the rent, carries with it the rent falling due thereafter. The holder of the reversion' — appellant in this case — 'may indeed, sever the rent from the reversion; but, unless it is specially reserved, the rent follows the reversion as a part of the realty.' For the rest, we cite Tubb v. Fort, 58 Ala. 277, [for] the proposition that whoever is entitled to the reversion when the rent falls due is also entitled to the rent unless it has been previously severed, and the purchaser at mortgage foreclosure sale is entitled to the rent afterwards falling due as against the assignee of the tenant's obligation to pay whose interest was acquired in subordination to the previous mortgage. In other words, the mortgagor could not, as against the purchaser at the foreclosure sale under a mortgage previously executed, effectuate a severance of rents by an assignment thereof before foreclosure if the assignee is charged with notice of the mortgage, and that it might be foreclosed before the maturity of the rent. The Bank of Moundville was such an assignee and it is responsible to appellant purchaser at foreclosure sale before the rents become due." (Citations omitted.)
Because, therefore, a severance of the rents by an assignment cannot be made voluntarily by the mortgager to the detriment of the mortgagee-purchaser, it follows that such a severance likewise cannot be made involuntarily by a garnishment. This result must follow because the judgment creditor "stands in the shoes" of the judgment debtor-mortgagor, and in that position the judgment creditor cannot use garnishment to force the tenants to make *Page 59 
payments to the creditor which the judgment debtor could not force them to make to the debtor himself. Pettus, supra.
This result is consistent with the language of Code of 1975, § 35-4-32, viz.: "Every conveyance of an estate in any hereditament, corporeal or incorporeal, is good and effectual without attornment of the tenant; but no tenant who has paid his rent without notice of such conveyance is liable therefor."
In support of its position, plaintiff cites us to Mack v.Beeland Brothers Mercantile Co., 21 Ala. App. 97, 105 So. 722
(1925). Respectfully, we note that we do not find that decision inconsistent with our decision here. In that case, one Parker owned lands that he mortgaged to one Mack. There is no indication in the opinion that the mortgage itself limited the mortgagor's rights to the rent, payable in cotton. Later, in 1922, Parker executed a one-year lease of these lands to Bush, who agreed to pay, on October 1, as the rent, 1,000 pounds of cotton. In July, Beeland Brothers levied an attachment against Parker under which it garnished Bush, the tenant. During the next month Mack, the mortgagee, notified Bush that the mortgage, which had been in default, was due, and demanded the 1922 rent. Bush answered the garnishment by stating that a warehouse receipt for the cotton had been deposited in a bank with instructions to deliver it to the court-designated party. The court held that the garnishment lien validly attached to the cotton, and that the mortgagee, Mack, acquired no lien on the cotton by virtue of the notice served upon the tenant, Bush, thereafter.
This Court is unpersuaded by Davis's argument that Mack,supra, is the controlling authority. As previously noted, there is no indication in the Mack opinion that the mortgagor's right to receive rent was limited by the mortgage itself, as was Centennial's under the mortgage executed by it to AFS. This mortgage stated in pertinent part:
 "NOW THEREFORE, the Mortgagor, in consideration of the indebtedness above mentioned, . . . has bargained and sold and does hereby grant, bargain, sell, and convey unto the Mortgagee, . . . the following described real estate together with . ..
 "All rents, profits, issues and revenues of the Mortgaged Property from time to time accruing . . . reserving to the Mortgagor, however, so long as Mortgagor is not in default hereunder, the right to receive and retain the rents, issues and profits thereof. . . ." (Emphasis added.)
We note that this right to receive rents is conditional. Once default occurs, under the plain language of the mortgage, the mortgagor is divested of any right to rents that subsequently accrue. Furthermore, contrary to Davis's argument otherwise, there is no requirement, either contractual or statutory, that notice be given before Centennial is divested of this conditional right.
In addition to the mortgage language conveying future rents to AFS, Centennial executed the aforementioned "Conditional Assignment of Leases and Rentals" setting over to AFS all then-existing and future leases of Centennial in the mortgaged property and all rents arising from said leases as additional security for the loan from AFS. This agreement states:
 "4. Rights Prior to Default: Unless and until Landlord, or others liable therefor, defaults in the performance of any of the terms and/or covenants contained in said Note or Mortgage . . . or this agreement, Landlord, shall have the right to exercise all of the rights, powers and authorities as Landlord under said lease, subject at all times to the limitations and provisions of paragraph designated '5' of this agreement."
As in the mortgage, there is no requirement that notice be given before Centennial is divested of its right to receive rents.
Davis argues that notice to the tenants is a condition precedent to AFS's entitlement to future rents. We do not agree with Davis's interpretation of the notice provision in the "Conditional Assignment of Leases and Rentals," which provides:
 "A notice in writing by AFS to the tenants advising the latter that a default *Page 60 
has occurred on the part of the landlord in the performance of the terms, provisions and covenants in the aforesaid note and mortgage or of this agreement, and requesting that all future accruals of rents or other payments under said leases be paid to AFS under this agreement, shall be construed as conclusive authority for such payment to be made to AFS and from and after the date of the giving of such notice all accruals of rents or other payments under said leases shall be paid to AFS pursuant to this agreement and such notice."
Relying on Mack, supra, Davis argues that AFS's right to rentals springs into existence only after notice is given to the tenants that AFS intends to claim rents; that such notice was given only after the writs of garnishment were served; and, therefore, that Davis's lien attached first and preempted any conditional right AFS might have, until Davis's judgment against Centennial is satisfied.
We find nothing in the language of this notice provision or in Code of 1975, § 35-4-32, cited above, to indicate that notice is necessary to "perfect" AFS's right to the rents. We interpret these notice provisions as mere protective devices that serve to limit the liability of a tenant who pays rent to his former landlord before he receives notice of a conveyance, default, or foreclosure. Even so, AFS did give actual notice to the tenants on October 28, 1987, before rent was due for the month of November, and again on November 2, 1987, that the mortgage had been foreclosed and that AFS had purchased the building.
Several aspects of the Mack decision distinguish it from this case. The most significant distinction is that in Mack there was no foreclosure, nor any other conveyance, of the mortgaged property.
Ala. Code 1975, § 35-9-33, provides: "The claim of the landlord for rent and advances, or for either, may be by him assigned; and the assignee shall be invested with all the landlord's rights, and entitled to all his remedies for their enforcement."
The conditional assignment of rents by Centennial "invested" AFS with Centennial's right to collect rents once default occurred. We see no suggestion in the Mack case that the rents were assigned to the mortgagee, as they were here. Such an assignment, by its own terms and under this statute, clearly gives AFS the right to maintain an action to recover rents, should the tenants default under the terms of their leases.
Therefore, the garnishees were not holding money or property belonging to Centennial at the time the writs of garnishment were served, or at the time of their answers, or at any time in the interim. Nor did the lease agreements between Centennial and the garnishee-tenants represent contracts upon which Centennial was owed a debt at the time of service of the writs or thereafter.
Garnishment is a purely statutory proceeding, defined by Ala. Code 1975, § 6-6-370, as:
 "process to reach and subject money or effects of a defendant in attachment, as in a judgment or in a pending action commenced in the ordinary form in the possession or under the control of a third person, or debts owing such defendant or liabilities to him on contracts for the delivery of personal property, on contracts for the payment of money which may be discharged by the delivery of personal property or on contracts payable in personal property. . . ."
Furthermore, as noted in Sloss v. Glaze, 231 Ala. 234,164 So. 51, 53 (1935), "it [garnishment] is always administered upon equitable principles." In that case, Sloss had a garnishment writ issued on April 22, 1931, against Glaze in aid of a pending suit against one Aland. The writ was served on April 23, 1931, and Glaze answered "no indebtedness," which was contested. Sloss subsequently recovered a judgment against Aland, and the contest hearing resulted in judgment in favor of the garnishee. The plaintiff, Sloss, then appealed.
The undisputed facts were that Aland had executed a mortgage of certain property to the First National Bank of Birmingham *Page 61 
to secure his indebtedness to the bank. By written instrument dated April 9, 1931, which was duly recorded, the bank released a certain parcel of the mortgaged property with the oral understanding that under the terms of the agreement, Aland, who was then contemplating a trade of the property for property owned by one Yates, would either give the bank the proceeds of the trade or a mortgage on the property received in the exchange.
Aland and Yates consummated the trade, and Aland then entered into a contract with Glaze to sell the newly acquired property to him, still with the understanding that he would account to the bank for the proceeds of that exchange. This contract was executed on April 16, 1931. Several days thereafter, the aforementioned writ of garnishment was issued and served on Glaze. The garnishee answered that the executory contract between him and Aland represented no debt subject to garnishment because it merely called for the assumption of mortgage debt and the execution of an additional mortgage payable in the future.
In deciding the case, this Court clearly stated the rationale on which we affirm the judgment in the instant case. QuotingMarx v. Parker, 9 Wn. 473, 37 P. 675 (1894), the Court stated:
 " 'It is a general rule in garnishment that the plaintiff can obtain no greater beneficial relief against the garnishee than the judgment debtor would be entitled to, and that if the debtor's recovery would be limited to a mere legal title, without beneficial interest or right of enjoyment in himself, the proceeding must fail. A judgment creditor cannot have his debt satisfied out of property held in trust for another, no matter how completely his debtor may have exercised apparent ownership over it, unless it was upon the faith of such ownership that the credit was given. * * * Therefore, if the deposit in the bank was, in equity, the property of the city, although it stood in Parker's name, respondents had no right to a judgment against the garnishee.' This case [Marx v. Parker] was quoted and the principle therein announced followed by the Court of Appeals in Allen v. Woodruff, 2 Ala. App. 415, 56 So. 247, 249, which latter case was approvingly cited by this court in Pettus v. Dudley Bar Co., 218 Ala. 163, 118 So. 153, 154 [(1928)], wherein the underlying principle was recognized and given application. In Allen v. Woodruff, the court said: 'Garnishment proceedings were provided by statute to enable a creditor to reach property and funds of his unwilling debtor which cannot be reached by execution, but which, in equity and justice, should be applied to the payment of the debtor's debts. They were not intended to enable the creditor to subject properties or funds which in truth do not belong to the debtor, and which should not, as a matter of equity, be applied to the payment of his debts.'
 "And to like effect is the language in Pettus v. Dudley Bar Co., supra: 'Garnishment proceedings were not intended to entitle a creditor to hold such properties or funds which in truth do not belong to the debtor and which should not as a matter of equity be applied as a payment of his debts.'
 "Applying this principle to the instant case, the correctness of the ruling in the court below is apparent.
 "The First National Bank, under the undisputed proof, released to Aland, the debtor, real property embraced in its mortgage, with the express understanding it should receive the property or its proceeds acquired by Aland in the exchange.
 "Any part of the purchase price therefore due to be paid Aland was in equity and good conscience to be treated as the property of the bank. Aland so desired it, and in order to effectuate his prior agreement with the bank, Aland and Dr. Glaze, after the service of the garnishment writ, canceled the contract and the real estate agency that had received the earnest money refunded the same to Dr. Glaze. This the parties had a right to do. There was no fraud or bad faith involved, and the evident purpose was to have consummated the original and prior agreement existing between Aland and the bank. *Page 62 
 "True, Aland's contract with Dr. Glaze was canceled, and the property deeded to the bank after the issuance and service of the garnishment writ. But all this was done in recognition of the pre-existing right of the bank, and in accordance with the agreement between Aland and the bank that had been entered into prior to any garnishment proceedings, and to carry out such agreement made before plaintiffs took any steps to collect their account against Aland. The fact that plaintiffs were not informed as to such pre-existing right is immaterial. Garnishment 'proceedings cannot displace prior valid and bona fide existing rights and claims against the debt or property involved. Plaintiff in garnishment does not stand in the position of a purchaser in good faith and for value, but is in no better position than a purchaser or an assignee with notice.' 28 Corpus Juris 256; Butler v. Savannah Guano Co., 122 Ala. 326, 25 So. 241; Jones v. Lowery Banking Co., 104 Ala. 252, 16 So. 11.
 "Here, as in Marx v. Parker, and Allen v. Woodruff, supra, the debtor's interest is limited to a mere legal title, without beneficial interest or right of enjoyment in himself. The beneficial interest was in the bank under the previous agreement of the parties, and to sanction the condemnation of the debt to the satisfaction of plaintiffs' demand, would but result in taking from the bank that which in equity and good conscience belongs to it, and paying plaintiffs' debt therewith. This would run counter to all equitable principles under which such proceedings are administered.
". . . .
 "Citing Pettus, supra, this Court went on: 'Garnishment proceedings were not intended to entitle a creditor to hold such properties or funds which in truth do not belong to the debtor and which should not as a matter of equity be applied as a payment of his debts.' These expressions are here directly applicable.
 "Defendant had released from the bank mortgage realty of sufficient value to effect an exchange for the property sold to Dr. Glaze, and under the specific agreement that such exchanged property should take the place of that released. To hold the garnishee to liability in such a case would be applying to the payment of defendant's debts property or funds 'which in truth do not belong to the debtor, and which should not as a matter of equity' be so applied."
We can affirm AFS's summary judgment only if we find that there was no genuine issue of material fact and that AFS was entitled to a judgment as a matter of law. Rule 56(c), A.R.Civ.P.; Ward v. Rhodes, Hammonds Beck, Inc.,511 So.2d 159 (Ala. 1987); Whitehead v. Johnston, 467 So.2d 240 (Ala. 1985); Black v. Freeman Lumber Co., 509 So.2d 914
(Ala.Civ.App. 1987). Furthermore, we must view the evidence in a light most favorable to the non-moving party, and "summary judgment is improper if there is a scintilla of evidence to support the non-moving party." Mann v. City of Tallassee, 510 So.2d 222,225 (Ala. 1987), citing Hale v. City of Tuscaloosa,449 So.2d 1243, 1245 (Ala. 1984).
The operative facts of this case, as stated hereinabove, are undisputed. After careful study of the record, this Court finds that the equitable principles set out in Sloss, supra, in conjunction with the legal standards cited herein, mandate that AFS's summary judgment be, and it hereby is, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.